IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **RED WOLF ENGINEERING, LLC,**<br>5965 Exchange Drive, Suite C<br>Eldersburg, Maryland 21784,<br><br>*Plaintiff,*<br><br>v.<br><br>**COMBAT TACTICAL LASER, LLC,**<br>1211 Markham Lane<br>Pasadena, Maryland 21122,<br><br>**ROBERT ADAMS, SR.,**<br>1581 Marco Drive<br>Pasadena, Maryland 21122, and<br><br>**PAUL W. TOLLE,**<br>1211 Markham Lane<br>Pasadena, Maryland 21122,<br><br>*Defendants*. | Civil Action No. ____________________<br><br>**INJUNCTIVE RELIEF REQUESTED**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Red Wolf Engineering, LLC ("RWE"), by and through undersigned counsel, brings this action against Defendants Combat Tactical Laser, LLC ("CTL"), Robert Adams, Sr. ("Adams"), and Paul W. Tolle ("Tolle"), and alleges as follows:

## NATURE OF THE ACTION

1. This action arises from CTL's unauthorized appropriation and commercialization of a production-ready firearm-mounted laser system that RWE independently designed, developed, and brought to market readiness. CTL had previously spent years failing to build a working product from its own motion-activated laser concept and design. After RWE successfully developed a workable alternative, CTL demanded RWE's proprietary technical and manufacturing

materials and ultimately launched the CTL-200 under its own name without obtaining a written assignment or unrestricted license from RWE.

2. In 2024, CTL approached RWE about evaluating CTL's failed approach. RWE, by and through its co-owners, Lowell Seal ("Seal") and Brett Gidge ("Gidge"), thereafter independently developed an entirely different firearm-mounted laser system that used electrical/electronic architecture, printed-circuit-board design, firmware, related software, motion-and-orientation logic, and a mechanical design that was different than CTL's original design.

3. RWE also developed manufacturing specifications, programming tools, product literature, supplier relationships, and production processes required to bring the new laser system to market.

4. RWE and CTL executed a bilateral Confidentiality and Non-Disclosure Agreement effective April 15, 2024 (the "NDA"). The NDA required CTL to use RWE's confidential information only for the parties' relationship, prohibited use for CTL's independent benefit or to RWE's detriment, restricted disclosure to authorized representatives bound by comparable obligations, and expressly provided that RWE's information remained RWE's property. The NDA granted CTL no license or ownership rights. RWE does not dispute that the NDA also protects CTL's pre-existing Confidential Information; RWE's claims concern separate Confidential Information and technical work product that RWE independently created.

5. RWE is the sole plaintiff. RWE's co-owners, Seal and Gidge, later signed a CTL Operating Agreement in their individual capacities and received personal membership interests in CTL.

6. The CTL Operating Agreement does not assign to CTL any inventions or other intellectual property that its members, including Seal and Gidge, create.

7. RWE did not become a CTL member and did not execute any assignment or other instrument transferring its corporate intellectual property, technical files, source code, collection rights, or other proprietary assets to CTL. RWE is the assignee of the intellectual property rights in and to the laser system that Gidge and Seal invented.

8. After RWE brought its firearm-mounted laser system to production readiness and had incurred significant development costs, CTL demanded RWE's complete technical and manufacturing package, contacted RWE's suppliers, terminated the relationship, and wrongly asserted that RWE possesses no rights in its laser system.

9. CTL now markets and sells the "CTL-200" as a motion- and orientation-activated laser system that is identical to RWE's laser system. CTL publicly claims that the product designs and "MALTS" technology belong to CTL, while advertising features that correspond to nonpublic engineering and firmware functions created by RWE. CTL never obtained a written assignment or unrestricted license from RWE.

10. RWE seeks to recover at least $161,649 in presently known damages, together with any additional damages established through discovery, Defendants' unjust enrichment, exemplary damages, attorneys' fees, and costs recoverable under applicable law. RWE also seeks preliminary and permanent injunctive relief prohibiting any further use or disclosure of its protected information, the return or destruction of its tangible property and all copies of its technical files, and all other relief available under the NDA, the Defend Trade Secrets Act, the Maryland Uniform Trade Secrets Act, and other applicable law.

## PARTIES

11. Plaintiff RWE is a Maryland limited liability company with its principal place of business at 5965 Exchange Drive, Suite C, Eldersburg, Maryland 21784. RWE has operated since 2013 and provides professional product development, electrical, mechanical, software, manufacturing development, and consulting services.

12. Seal and Gidge are RWE's co-owners and principals. They performed or directed the RWE work at issue, but they are not plaintiffs and assert no individual membership or governance claims in this action.

13. Defendant CTL is a Maryland limited liability company formed under Maryland law on January 9, 2021. Its registered office is located at 1211 Markham Lane, Pasadena, Anne Arundel County, Maryland 21122. CTL also uses a mailing address at 4157 Mountain Road, No. 145, Pasadena, Maryland 21122.

14. Defendant Adams is a Maryland resident residing in Anne Arundel County. Adams is a co-founder and Manager of CTL. He signed the NDA on CTL's behalf, directed RWE's work, received RWE's protected information as CTL's representative, demanded RWE's technical materials, and personally participated in the conduct alleged below.

15. Defendant Tolle is a Maryland resident residing in Anne Arundel County. Tolle is a co-founder and Manager of CTL. He directed aspects of the parties' relationship, received RWE's protected information as CTL's representative, participated in the termination and supplier contacts, and personally participated in the conduct alleged below.

16. At all relevant times, Adams and Tolle acted for CTL and also directly participated in, authorized, directed, or ratified the conduct alleged below.

## JURISDICTION AND VENUE

17. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-1839 ("DTSA"). The Court also has original jurisdiction under 18 U.S.C. § 1836(c), which provides that the district courts of the United States have original jurisdiction over civil actions brought under the DTSA.

18. RWE is the owner of trade secrets that have been misappropriated and that are related to products and services used in, or intended for use in, interstate and foreign commerce, including the "CTL-200" firearm-mounted laser system that CTL markets and sells through its public website, and related engineering, sourcing, manufacturing, supplier, firmware, and production-development services.

19. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over RWE's related state-law and contract claims because those claims are so related to the DTSA claim that they form part of the same case or controversy.

20. This Court has personal jurisdiction over CTL because CTL is organized under Maryland law, maintains its registered office in Anne Arundel County, transacts business in Maryland, and committed the acts alleged in Maryland.

21. This Court has personal jurisdiction over Adams and Tolle because they are Maryland residents, transacted business and performed work and services in Maryland, and personally participated in conduct causing injury in Maryland.

22. Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in Maryland and a substantial part of the events or omissions giving rise to the claims occurred in Maryland.

23. The NDA provides that Illinois substantive law governs the NDA. RWE therefore pleads Count III under Illinois substantive law. RWE demands a jury trial on all claims and issues so triable.

## FACTUAL ALLEGATIONS

### A. CTL's Unsuccessful Development Efforts

24. CTL was formed to develop and commercialize a firearm-mounted laser sight that would activate and deactivate based on a firearm's movement and orientation.

25. Before engaging RWE, Adams, Tolle, and another engineer had spent approximately three to four years attempting to create a working product based on a Hall Effect sensor and an inertial-measurement-unit approach. CTL had no viable, production-ready design, leading to its decision to engage RWE.

26. In spring 2024, Adams approached Seal, a former colleague, and requested RWE's technical assessment. After RWE spent significant resources evaluating CTL's concept, on June 10, 2024, RWE advised CTL that its approach was unnecessarily complex, costly, and unsuitable for commercialization, and CTL asked RWE to develop an alternative.

27. RWE thereafter developed a materially different, clean-sheet design centered on a three-axis accelerometer, custom electronics, and custom firmware. The RWE design did not carry forward CTL's original electrical design, mechanical design, components, or source code. CTL directed RWE to proceed with the new design.

28. RWE is the rightful owner, by assignment, of the new design it invented and built.

29. RWE does not claim ownership of CTL's original product concept or pre-existing design. RWE's claims concern the separate electrical, mechanical, firmware, software, manufacturing, supplier, and other technical work product that RWE subsequently created.

**B. The NDA and RWE's Independent-Contractor Status**

30. On May 27, 2024, CTL and RWE executed the NDA, effective as of April 15, 2024. RWE executed the NDA under the ordinary business name "Red Wolf Engineering," which referred to Plaintiff Red Wolf Engineering, LLC. *See* Confidentiality and Non-Disclosure Agreement between CTL and RWE, effective April 15, 2024, attached hereto as Exhibit A.

31. The NDA broadly defines "Confidential Information" to include technical information, drawings, schematics, blueprints, software, programs, source code, know-how, trade secrets, products, processes, models, inventions, research, developments, vendor lists, and information disclosed in connection with the parties' relationship. Ex. A § 1.

32. The NDA requires the recipient to keep Confidential Information secret and in the strictest confidence; to use it only for the purpose of the ongoing relationship; not to use it for the recipient's own benefit, to the detriment of the disclosing party, or adversely to the disclosing party's interests; and to protect it from unauthorized disclosure. Ex. A § 3.

33. The NDA permits disclosure only to representatives with a need to know who are advised of the NDA and bound by substantially comparable use and disclosure restrictions. It makes CTL responsible for breaches by its representatives and requires prompt notice of any unauthorized disclosure or unintended use. *Id.*

34. The NDA expressly provides that Confidential Information remains the property of the disclosing party and that no provision grants the recipient any license or other right in that information. Ex. A § 5.

35. The NDA recognizes that actual or threatened breach causes irreparable harm, authorizes injunctive and specific-performance relief, and other remedies, and permits the prevailing party to recover costs and reasonable attorneys' fees. Ex. A §§ 7-8.

36. The NDA identifies RWE as an independent contractor. Section 2 contemplates that compensation, if any, together with the type and extent of services, would be addressed in a separate writing; Section 2 does not assign or otherwise address the ownership of intellectual property. Section 5 separately provides that Confidential Information remains the property of the disclosing party and grants the recipient no license or other right in that information. Ex. A §§ 2, 5.

37. On August 15, 2024, Seal sent to Adams a proposed RWE Services Agreement that, if executed, would have governed the arm's-length relationship between RWE and CTL and addressed rates, payment terms, dispute procedures, and intellectual-property ownership. CTL never executed the proposed agreement. RWE and CTL never executed a separate assignment of RWE's intellectual property, either.

**C. RWE Creates the Production-Ready Technology**

38. RWE initially created a proof of concept using an RWE circuit-board it developed for an unrelated project and custom firmware written by RWE. The proof-of-concept demonstrated that RWE's accelerometer-based architecture could perform the desired motion- and orientation-based functions.

39. By July 2024, RWE had completed the first custom circuit-board schematic, including a microcontroller, three-axis accelerometer, USB charging circuitry, Bluetooth antenna, laser driver and control circuitry, and related component architecture.

40. RWE developed proprietary firmware implementing barrel-angle logic, gesture-based enable and disable functions, motion timers, automatic laser shutoff, sleep and wake functions, battery monitoring, grip-angle and orientation controls, safety lockout, boot-loader functionality, and over-the-air firmware and parameter updates.

41. RWE also created a new mechanical design from a clean sheet. The design included a more compact housing, different laser and battery components, universal rail adapters and interchangeable cleats, thumbscrew clamps, O-ring adjustment mechanisms, and a custom dual-purpose mounting and adjustment tool.

42. RWE developed the bill of materials, supplier qualifications, custom component specifications, sourcing strategy, manufacturing processes, programming fixture, production automation software, packaging design, production documentation, and other materials needed to manufacture and program the product at scale.

43. RWE performed the work at its Maryland facility, using RWE personnel, systems, tools, equipment, know-how, pre-existing technology, and supplier relationships. RWE maintained the native engineering and production files on RWE-controlled systems and did not deliver CTL the complete source code, native CAD files, printed-circuit-board fabrication files, programming software, or other materials needed to reproduce the design independently.

44. RWE supplied CTL only the limited information and prototype access reasonably necessary for field testing, market testing, public demonstration, assembly discussions, evaluation, and the parties' contemplated relationship. Providing prototypes for those purposes did not assign RWE's underlying technical work product or authorize CTL to copy, reverse engineer, independently manufacture from, or otherwise exploit RWE's nonpublic engineering materials after the relationship ended.

### D. RWE Remained a Separate Entity and Did Not Assign Its Assets Under the Operating Agreement

45. In October 2024, Seal and Gidge signed an Amended and Restated Operating Agreement for CTL in their individual capacities. The Operating Agreement lists Seal and Gidge,

not RWE, as CTL members. *See* copy of the Amended and Restated Operating Agreement of CTL, dated October 23, 2024, attached hereto as Exhibit B.

46. RWE did not sign the Operating Agreement and did not agree to be bound by its capital-contribution, governance, mediation, or arbitration provisions.

47. The Operating Agreement lists *personal* capital contributions for Seal and Gidge of $15,000 each, described as “cash, property and services.” It does not identify RWE as a member, identify RWE’s corporate intellectual property as contributed property, assign RWE’s intellectual property, transfer RWE’s collection rights or receivables, or state that CTL would own RWE’s work product.

48. During the relationship, Seal advised Adams that his and Gidge’s capital obligations to CTL were “being fulfilled now as part of the ongoing design and development efforts.” RWE continued performing substantial engineering work thereafter, and Seal and Gidge advised CTL that the value of the engineering effort being contributed in connection with CTL exceeded their required capital contributions.

49. CTL did not provide Seal or Gidge with any accounting or valuation of their contributions, any information regarding the contributions of any of the other members, if any, nor did CTL identify any quantified contribution deficiency, or otherwise explain how the substantial engineering services performed in connection with CTL were being credited against their respective contribution obligations before purporting to cancel their membership interests.

50. Seal and Gidge did not execute any instrument, individually or on RWE’s behalf, assigning RWE’s corporate technology, source code, circuit-board files, software, supplier information, manufacturing files, development receivables, or other assets to CTL.

51. Any dispute between CTL and Seal or Gidge concerning personal membership interests is separate from the claims pleaded here and is not asserted in this action.

52. RWE's claims arise from RWE's own NDA, property, trade-secret rights, professional services, and tangible property. CTL cannot extinguish RWE's corporate rights by canceling membership interests held by different legal persons.

**E. RWE's Development Work, Equity Discussions, and Unpaid Costs**

53. RWE is a professional engineering business that charges for its product-development and engineering services and does not ordinarily provide substantial work gratuitously.

54. During the parties' discussions concerning Seal's and Gidge's potential equity participation in CTL, RWE temporarily refrained from invoicing CTL for development labor while continuing to perform and contemporaneously record that work and its associated costs. RWE never executed an agreement permanently waiving its right to compensation, assigning its corporate receivable, or transferring its intellectual property to CTL.

55. RWE repeatedly advised CTL of costs already incurred and projected costs for additional electrical, mechanical, firmware, sourcing, prototyping, procurement, and production-readiness work. CTL directed RWE to continue.

56. RWE maintained contemporaneous time and cost records in the ordinary course of business. RWE presently calculates that CTL requested and accepted at least $117,155 in uncompensated development labor and $44,494.04 in unpaid production and material costs.

57. CTL made approximately $11,517.24 in payments designated for prototype parts and materials but did not pay RWE cash compensation for the development labor at issue. Those

material payments did not purchase or assign RWE's technology, source code, engineering files, or manufacturing rights.

58. CTL's own May 28, 2025, demand letter acknowledged that CTL engaged RWE for procurement, assembly, programming, and related work; acknowledged agreed administrative, assembly, and programming charges; and acknowledged that RWE had fronted substantial costs for production parts. *See* CTL's Termination and Demand letter to RWE dated May 28, 2025, attached hereto as Exhibit C.

59. RWE transformed CTL's failed concept into a functioning, production-ready product. CTL accepted that work, commercialized it, and did not fully compensate RWE for the labor and development costs it incurred.

**F. CTL Terminates the Relationship and Demands RWE's Property**

60. By spring 2025, RWE had completed more than fifty (50) prototypes and had developed the product, supply chain, tooling, programming, and production processes for an initial production run.

61. In the second quarter of 2025, newly imposed tariffs materially increased the anticipated cost of the planned production run. CTL had not secured financing sufficient to fund an initial production run of approximately 500 units, which would have required RWE to advance approximately $50,000 in production costs. RWE and CTL agreed to defer ordering production materials while evaluating the tariff and financing issues; RWE did not unilaterally halt production.

62. On April 25, 2025, Adams demanded that RWE deliver the complete build packages, including design files, schematics, firmware source code, manufacturing specifications, production files, and supplier information. RWE refused because CTL had never obtained a written

assignment or unrestricted right to RWE's technical materials or to manufacture from those materials. Moreover, CTL's management had demonstrated an inability to prepare the company for a commercial launch, failing to secure adequate financing, set up proper accounting, or procure necessary insurance.

63. On May 19, 2025, hours after Seal and Gidge proposed a restructuring intended to address CTL's management and financing failures, CTL purported to cancel their individual membership interests. *See* cancellation letter and related resolution concerning Seal and Gidge, attached hereto as Exhibit D; Ex. C.

64. CTL purported to cancel Seal's and Gidge's individual membership interests based on an asserted failure to make their required capital contributions. Before the cancellation, CTL did not provide Seal or Gidge with a contribution ledger or other accounting establishing the amount of any alleged deficiency.

65. The cancellation did not transfer any RWE assets. RWE was not a CTL member and never agreed that canceling another person's equity would convey RWE's technology or receivables.

66. On May 28, 2025, CTL terminated all relationships with RWE and demanded delivery of components for approximately 500 units, the names and contact information of RWE's vendors, a detailed accounting, and related materials. CTL simultaneously asserted that RWE had no right to produce, assemble, market, sell, or exploit the product and claimed that the product and related intellectual property belonged to CTL. *See* Ex. C.

67. No executed written agreement assigns RWE's intellectual property to CTL. The NDA affirmatively provides that RWE's Confidential Information remains RWE's property and

grants CTL no license or other right in that information. The Operating Agreement does not involve RWE as a member or contain any assignment from RWE. *See* Ex. B.

**G. Supplier Contacts and the China Manufacturing Issue**

68. CTL's May 28, 2025, letter acknowledged that custom parts for the proposed production run were to be procured from China. RWE had developed and managed the supplier relationships and custom component specifications used for those parts. *See* Ex. C.

69. After the relationship ended, Adams, Tolle, and/or CTL contacted RWE's suppliers directly and attempted to obtain RWE's proprietary specifications, design information, files, pricing, supplier contacts, or custom components without RWE's authorization.

70. CTL now advertises the CTL-200 as "assembled in the USA" and offers it for immediate sale. *See* Ex. E. On information and belief, CTL has used one or more third-party component suppliers or manufacturers, including suppliers or manufacturers located in China, to obtain or reproduce custom components used in the CTL-200. *See* July 14, 2026, printout of CTL's CTL-200 product page, attached hereto as Exhibit E.

71. RWE never provided CTL with the complete native files, source code, fabrication files, programming package, or other manufacturing materials required to reproduce the product. Yet, after demanding those files and contacting RWE's suppliers, CTL subsequently began marketing and selling a product embodying RWE-specific functions. In doing so, CTL acquired, disclosed, used, or caused others to use RWE's protected information without authorization.

**H. CTL Publicly Commercializes RWE-Derived Features**

72. CTL now markets and sells the CTL-200 for approximately $379 and describes it as the world's first motion-activated laser sight incorporating patent-pending "MALTS" technology. *See* Ex. E.

73. CTL’s public product materials advertise automatic activation based on motion; adaptive barrel- and grip-angle logic; motion-based gestures, automatic shutoff in high- and low-ready positions; sleep mode during inactivity; rechargeable USB-C power; and firearm rail compatibility. *Id*.

74. Those advertised functions correspond to features RWE conceived, engineered, implemented, tested, and refined in its nonpublic circuit architecture, firmware, mechanical design, and production work.

75. RWE subsequently acquired and examined a CTL-200. In material respects, the CTL-200 corresponds to the later RWE design rather than CTL’s original design. Its observed and advertised features, including the three-axis accelerometer for orientation-driven functionality using the angle of the grip and barrel, gesture controls, Bluetooth functionality, swappable cleats for mounting universality, and auto-sleep functionality, correspond to features RWE conceived, engineered, implemented, tested, and refined in its nonpublic circuit architecture, firmware, mechanical design, and production work.

76. CTL’s website Terms & Conditions state that all “product designs” and the “MALTS” technology are CTL property, prohibit others from reproducing or creating derivative works, and represent that the technology is patent pending. *See* the July 14, 2026, printout of CTL's website Terms & Conditions, attached hereto as Exhibit F.

77. CTL’s public ownership assertion is inconsistent with the NDA, the absence of any assignment, RWE’s retention of the native technical files, and CTL’s prior demands that RWE surrender those materials.

78. On information and belief, Defendants have used, disclosed, retained, reproduced, or caused third parties to use or reproduce RWE's protected information to manufacture, program, assemble, source, market, or sell the CTL-200.

**I. RWE's Trade Secrets, Confidential Information, and Tangible Property**

79. RWE's trade secrets include, among other things, its nonpublic circuit-board schematic and layout; component selection and configuration; firmware source code and logic; motion, barrel-angle, grip-angle, gesture, sleep, wake, battery-monitoring, safety-lockout, boot-loader, and update functions; CAD files; dimensional tolerances; custom component specifications; manufacturing instructions; programming fixture and software; bill of materials; supplier pricing and qualifications; production processes; testing methods; and complete build package (collectively, the "RWE Trade Secrets").

80. The RWE Trade Secrets derive independent economic value from not being generally known or readily ascertainable. They represent years of engineering, testing, iteration, sourcing, and manufacturing development. A competitor possessing them could reproduce the product without bearing the time, cost, or risk that RWE incurred.

81. RWE took reasonable measures to protect the RWE Trade Secrets, including executing the NDA; retaining the native files on RWE-controlled systems; limiting CTL's access to information needed for the contemplated relationship; withholding source code, native CAD, fabrication files, and complete build packages; refusing CTL's demands for unrestricted delivery; limiting supplier access; and securing written supplier confirmation that RWE's files and custom components would not be released to CTL.

82. RWE's broader engineering, business, supplier, production, and technical information protected by the NDA constitutes "RWE Confidential Information," whether or not each item independently satisfies the statutory definition of a trade secret.

83. RWE also owns tangible personal property associated with the project, including RWE-funded prototype units, prototype hardware, programming fixtures, tooling, components, technical and code files, and physical storage media that RWE did not sell, assign, or transfer to Defendants (the "RWE Tangible Property").

84. Some prototype units were provided to CTL or third parties for testing, market evaluation, public demonstration, and field evaluation. Providing prototype hardware for those purposes did not transfer title to RWE-owned property, disclose RWE's source code or native files, or authorize continued possession, copying, disassembly, reproduction, distribution, or commercial use after the relationship ended.

**J. Continuing Harm and Need for Relief**

85. Defendants' continuing commercialization, supplier and manufacturer disclosures, possession of RWE property, and public claims of ownership threaten to destroy the secrecy and economic value of RWE's technology and to deprive RWE of control over its work.

86. Once source code, fabrication files, CAD files, supplier specifications, or manufacturing instructions are disclosed to additional manufacturers or suppliers, the disclosure cannot readily be undone and monetary damages alone will not fully remedy the loss.

87. RWE is entitled to expedited discovery identifying all manufacturers, suppliers, consultants, files, communications, products, import records, sales, revenues, and persons to whom Defendants disclosed or provided RWE information.

88. RWE is also entitled to damages, return of tangible property, return or destruction of all electronic and physical copies of its protected files, an accounting, and preliminary and permanent injunctive relief.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**
*(Against All Defendants)*

89. RWE incorporates the preceding paragraphs as if fully set forth herein.

90. This Count is brought under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839.

91. The RWE Trade Secrets constitute trade secrets under the DTSA because they include financial, business, scientific, technical, economic, and engineering information, including designs, prototypes, methods, techniques, processes, procedures, programs, and codes, that derive independent economic value from not being generally known or readily ascertainable through proper means and that RWE took reasonable measures to keep secret.

92. The RWE Trade Secrets are related to products and services used in, or intended for use in, interstate and foreign commerce, including the CTL-200 firearm-mounted laser system marketed and sold through CTL's public website, the engineering and product-development services RWE provided to bring the CTL-200 to market readiness, and the sourcing, supplier, manufacturing, and production processes used or intended to be used to commercialize the product.

93. Defendants acquired access to portions of the RWE Trade Secrets through a confidential relationship and for the limited purpose of evaluating and furthering the parties' contemplated relationship. Defendants knew or had reason to know that RWE owned the information, that the NDA restricted its use and disclosure, and that CTL had received no assignment or unrestricted license.

94. Defendants have misappropriated—and continue to misappropriate—the RWE Trade Secrets by acquiring additional RWE Trade Secrets through improper means; using Trade Secrets obtained through the parties' confidential relationship beyond any permitted purpose; disclosing them to unauthorized suppliers, manufacturers, consultants, engineers, or other third parties; exploiting them to manufacture, source, program, import, advertise, market, and sell the CTL-200; and retaining and using them after the relationship ended.

95. Adams and Tolle are personally liable for each act in which they directly participated, authorized, directed, or ratified.

96. Defendants' prior demands for RWE's complete files, direct contacts with RWE's suppliers, lack of independent production-ready technology, commercialization after termination, public advertising of RWE-developed functions, and assertion of ownership support a reasonable inference of actual or threatened misappropriation.

97. Defendants acted willfully and maliciously. They continued asserting ownership and selling the CTL-200 even after RWE refused to assign the RWE Trade Secrets and expressly denied authorization for their use or disclosure.

98. RWE has suffered actual loss, including loss of secrecy and control, lost licensing and commercialization value, and ongoing competitive harm. Defendants have also reaped unjust enrichment by avoiding the development costs they would otherwise have incurred.

99. RWE is entitled to preliminary and permanent injunctive relief under 18 U.S.C. § 1836(b)(3)(A), damages and a reasonable royalty under § 1836(b)(3)(B), exemplary damages for willful and malicious misappropriation under § 1836(b)(3)(C), reasonable attorneys' fees under § 1836(b)(3)(D), and all other available relief.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE MARYLAND UNIFORM TRADE SECRETS ACT**
*(Against All Defendants)*

100. RWE incorporates the preceding paragraphs as if fully set forth herein.

101. This Count is brought under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code, Commercial Law Article §§ 11-1201 through 11-1209.

102. The RWE Trade Secrets constitute trade secrets under MUTSA because they derive independent economic value from not being generally known or readily ascertainable by proper means and were subject to reasonable measures to maintain their secrecy.

103. Defendants acquired access to portions of the RWE Trade Secrets through a confidential relationship and for the limited purpose of evaluating and furthering the parties' contemplated relationship. Defendants knew or had reason to know that RWE owned the information, that the NDA restricted its use and disclosure, and that CTL had received no assignment or unrestricted license.

104. Defendants have misappropriated—and continue to misappropriate—the RWE Trade Secrets by acquiring them through improper means; using Trade Secrets obtained through the parties' confidential relationship beyond any permitted purpose; disclosing them to unauthorized suppliers, manufacturers, consultants, engineers, or other third parties; exploiting them to manufacture, source, program, import, advertise, market, and sell the CTL-200; and retaining and using them after the relationship ended.

105. Adams and Tolle are personally liable for each act in which they directly participated, authorized, directed, or ratified.

106. Defendants' prior demands for RWE's complete files, direct contacts with RWE's suppliers, lack of independent production-ready technology, commercialization after termination,

public advertising of RWE-developed functions, and assertion of ownership support a reasonable inference of actual or threatened misappropriation.

107. Defendants acted willfully and maliciously. They continued asserting ownership and selling the CTL-200 even after RWE refused to assign the RWE Trade Secrets and expressly denied authorization for their use or disclosure.

108. RWE has suffered actual loss, including loss of secrecy and control, lost licensing and commercialization value, and ongoing competitive harm. Defendants have also unjustly enriched themselves by avoiding the development costs they would otherwise have incurred.

109. RWE is entitled to preliminary and permanent injunctive relief under Md. Code, Commercial Law Article § 11-1202, damages and a reasonable royalty under § 11-1203, exemplary damages for willful and malicious misappropriation, reasonable attorneys' fees under § 11-1204, and all other available relief.

## COUNT III
## BREACH OF CONTRACT
*(Against CTL; Under Illinois Substantive Law)*

110. RWE incorporates the preceding paragraphs as if fully set forth herein.

111. The NDA is a valid and enforceable contract between RWE and CTL. RWE performed its obligations under the NDA or was excused from further performance.

112. The NDA required CTL to maintain RWE Confidential Information in strict confidence; use it only for the purpose of the parties' relationship; refrain from using it for CTL's own benefit, to RWE's detriment, or adversely to RWE's interests; disclose it only to representatives with a need to know who were bound by substantially comparable restrictions; remain responsible for representatives; provide prompt notice of unauthorized disclosure or

unintended use; recognize RWE's ownership; and return or destroy RWE's information on request. Ex. A §§ 3, 5.

113. CTL materially breached the NDA by using RWE Confidential Information outside the contemplated relationship and for CTL's independent commercial benefit; using it adversely to RWE; disclosing or causing disclosure to suppliers, manufacturers, consultants, engineers, or other third parties without authorization and without ensuring comparable protections; attempting to induce RWE's suppliers to provide protected information; failing to notify RWE of unauthorized use or disclosure; asserting ownership and license rights the NDA expressly withheld; and retaining and using protected information after terminating the relationship.

114. CTL further breached the NDA by failing to return or destroy all copies of RWE Confidential Information after the relationship ended.

115. CTL's breaches have caused and continue to cause RWE substantial harm, including loss of control over its technology, destruction of confidentiality, lost licensing opportunities, and the unjust avoidance of development costs CTL would otherwise have incurred.

116. The NDA recognizes that actual or threatened breach causes irreparable harm and authorizes injunctive and specific-performance relief. It also entitles the prevailing party to recover costs and reasonable attorneys' fees. Ex. A §§ 7-8.

117. RWE is entitled to damages, an accounting, return or destruction of its information, preliminary and permanent injunctive relief, costs, reasonable attorneys' fees, and all other relief available under Illinois substantive law and the NDA.

## <u>COUNT IV</u>
## QUANTUM MERUIT AND UNJUST ENRICHMENT, IN THE ALTERNATIVE
*(Against CTL)*

118. RWE incorporates the preceding paragraphs as if fully set forth herein.

119. This Count is pleaded in the alternative to the extent no enforceable written contract fixes compensation for the development services and costs at issue.

120. CTL requested that RWE provide professional electrical, mechanical, software, product-development, sourcing, prototyping, procurement, programming, tooling, manufacturing-development, and production-readiness services.

121. RWE provided those services for CTL's benefit with the reasonable expectation that its substantial professional engineering work would not be gratuitous. CTL knew RWE was a professional engineering firm, knew RWE maintained time and cost records, and knew that RWE had temporarily deferred invoicing while the parties explored an equity arrangement involving Seal and Gidge. No executed agreement provided that RWE would permanently surrender its right to compensation or its corporate intellectual property if that arrangement terminated.

122. The Operating Agreement does not fix compensation owed to RWE or transfer RWE's corporate assets. RWE was not a party to that agreement, the membership interests were held by Seal and Gidge individually, and no instrument assigns RWE's intellectual property or corporate receivable to CTL. To the extent CTL contends that RWE's engineering services constituted consideration for Seal's and Gidge's individual membership interests, CTL nevertheless purported to cancel those interests while retaining and commercializing the benefit of RWE's work.

123. CTL received and appreciated substantial benefits from RWE, including a functioning, production-ready product; prototypes; engineering services; firmware and software development; sourcing; supplier development; manufacturing processes; programming systems; tooling; and production planning.

124. After crediting approximately $11,517.24 in parts payments, the reasonable value of RWE's unpaid services and expenses is at least $161,649, comprising approximately $117,155 in development labor and $44,494.04 in uncompensated material costs, with the final amount to be proven at trial.

125. CTL has retained and monetized RWE's work while failing to compensate RWE for the significant development labor and material costs it incurred. Equity requires that CTL compensate RWE for the full value of the benefits it received.

126. RWE is entitled under quantum meruit to the reasonable value of the services CTL requested and accepted and, alternatively, to restitution and disgorgement of the benefit unjustly retained by CTL.

127. This Count seeks compensation for services, costs, and development value conferred on CTL and is independent of damages sought for the wrongful use or disclosure of trade secrets.

**<u>COUNT V</u>**
**CONVERSION**
*(Against All Defendants)*

128. RWE incorporates the preceding paragraphs as if fully set forth herein.

129. RWE owns and has the immediate right to possess tangible personal property that RWE funded and did not sell, assign, or transfer to Defendants, including RWE-funded prototype hardware, programming fixtures, tooling, components, physical storage media containing technical or code files, and other specifically identifiable tangible property (the "RWE Tangible Property").

130. To the extent Defendants initially obtained possession of any RWE Tangible Property for testing, evaluation, assembly discussions, or other limited purposes, that possession

did not transfer title and became unauthorized no later than termination of the relationship and Defendants' assertion of exclusive ownership.

131. Defendants have exercised unauthorized ownership, control, retention, use, transfer, distribution, copying, disclosure, or disposition over the RWE Tangible Property in a manner inconsistent with RWE's rights, including by using or providing prototype hardware or physical components to support reproduction, manufacturing, programming, marketing, and sale of the CTL-200.

132. RWE has not consented to Defendants' continued possession or exercise of dominion and hereby demands the immediate return of all RWE Tangible Property.

133. Adams and Tolle are personally liable to the extent they personally possessed, directed the transfer or use of, or exercised dominion and control over RWE Tangible Property.

134. This Count is limited to tangible personal property and tangible embodiments and does not depend on the secrecy of information as such. RWE separately seeks return, deletion, sequestration, and destruction of intangible electronic copies under the NDA and MUTSA.

135. As a direct result of the conversion, RWE has suffered loss of possession, loss of use, impairment in value, and investigative and recovery costs in an amount to be proven at trial.

136. RWE is entitled to return of the property, compensatory damages equal to its value and resulting loss, and all other available relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Red Wolf Engineering, LLC respectfully requests that the Court enter judgment in its favor and against Defendants and grant the following relief:

A. A declaration that RWE owns its trade secrets, confidential information, tangible property, and related work product, and that Defendants have no ownership or unrestricted right to use, disclose, reproduce, manufacture from, import, or commercialize those assets;

B. Preliminary and permanent injunctive relief under the DTSA, MUTSA, the NDA, and other applicable law prohibiting Defendants and persons acting in concert with them from using, disclosing, manufacturing from, importing, marketing, or selling products derived from RWE's trade secrets or confidential information;

C. An order requiring Defendants to identify all persons and entities to whom RWE's protected information or property was disclosed and to return, sequester, delete, or destroy all copies and embodiments of those materials;

D. Expedited discovery and an accounting concerning Defendants' use and disclosure of RWE's information, the manufacture and sale of the CTL-200, and all resulting revenues, costs, and profits;

E. Actual, compensatory, unjust-enrichment, reasonable-royalty, exemplary, and conversion damages, including at least $161,649 for the reasonable value of RWE's uncompensated services and costs, subject to proof and appropriate credit;

F. Return of RWE's tangible property;

G. Prejudgment and post-judgment interest;

H. Costs and reasonable attorneys' fees to the extent authorized by contract, the DTSA, MUTSA, or other applicable law; and

I. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

137. RWE demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

**SHULMAN ROGERS, P.A.**

*By: /s/Joshua A. Glikin*
Joshua A. Glikin, Esq. (Bar No. 26852)
Drew T. Ricci, Esq. (Bar No. 22043)
The Banner Building at McHenry Row
1215 East Fort Avenue, Suite 301
Baltimore, MD 21230
jglikin@shulmanrogers.com
dricci@shulmanrogers.com
Telephone: (410) 520-1342
Facsimile: (301) 230-2891

*Counsel for Plaintiff Red Wolf Engineering, LLC*